Good morning, your honors. Gretchen Fusilier on behalf of the appellant, Ms. Obiageli Agbu, if it please the court. Our position is that Ms. Agbu's conviction is based on unreasonable inferences, speculations, and assumptions. Examples of this start with the testimony of FBI Special Agent Nelms when asked during his examination at trial the basis for his concluding that Ms. Agbu had committed Medicare fraud. His answer was that, quote, my understanding is that the person who signed the EDT agreement for the company is ultimately responsible for the claims submitted to Medicare. And in this instance, Ms. Agbu appeared to be the individual who signed the document. This type of inference was also argued by the government in its brief when it indicates, even if Agbu did not personally, this is a quote, even if Agbu did not personally sign all the billing sheets, as the owner of IBON, she was responsible for every claim submitted through the company. These types of inferences we believe are unreasonable given the substantial background of this case and the unrefuted facts. Isn't the question, I mean, let's assume you're right about that. The question is whether overall there was sufficient, specific, substantial evidence. No. With those inferences perhaps supporting but not standing alone in any way at all with regard to her making payments to some of the marketers, making payments to some of the doctors, signing the original incorporation papers is at least part of it, being around when people were given material that they didn't appear to need, being around when there were course re-examinations being given. I mean, it's not a lot, but there's a fair amount. Your Honor, we don't believe that the information or the evidence, the testimony, supported the standard of beyond a reasonable doubt to show that she both knowingly and intentionally committed Medicare fraud. And that is because the testimony of Nelms was clear that she did not purchase any of the fraudulent prescriptions. Is that true? I thought there was at least some suggestion that she handed the money over to at least one of the doctors. There was one incident when her father contacted her and instructed her that one of the persons he had employed as a marketer that we know now was going to come to the office. He was unavailable to pick up an envelope and deliver it to her. There's absolutely no evidence that Ms. Ogbu wrote any checks. Actually, the testimony by the accountant was that he signed the documents forming IBON. And that initially, although he had put Mr. Ogbu's name on all those documents, Mr. Ogbu was the one who informed him, no, remove my name, put my daughter's name on it. And eventually, there were arrangements made for her to sign the SS4, which is an IRS document associated with IBON. Was there a specific marketer who testified that Ogbu would direct her to take beneficiaries to particular doctors? Your Honor, that might have been Candy or Zoila, I believe. Right. Did she also testify that Ogbu paid her cash for her work more than twice? When she was first interviewed by the FBI, she said that she was never paid by Ms. Ogbu. During her testimony, however, she said that there was one instance when she went to the office and Ms. Ogbu gave her an envelope with cash in it. Or a check as directed by Ms. Ogbu's father, Charles Ogbu. Say more than twice? Pardon me, Your Honor? You didn't say that happened more than twice? My recollection is that it was once. Go ahead. I mean, for substantial evidence purposes, the fact that she may have contradicted herself is not really relevant, right? Pardon me? In fact, for substantial evidence purposes, the fact that she said something different at the trial doesn't matter. The question is, what did she say at the trial, and could somebody have believed it? Well, yes. Obviously, if the jury believed her testimony, that would suffice. However, when we look at all of the other facts, which are unreasonable to infer guilt, for example, the government indicates the Agape manual was found at IBON. Well, it was not unusual, and it certainly is not reasonably indicative of knowingly and intentionally violating the health care fraud. Agape was a third party certified by Medicare to perform billing services. The manual, there was no evidence indicating whether or not Ms. Ogbu had ever been instructed on the contents of the manual, what the contents of the manual actually were. And this would be an unreasonable inference that the mere presence of this manual indicates criminal intent knowingly done. Also, we have the government's argument that, similar to the case of Iroque, the fact that her name appeared on some of the billing sheets and that her name appeared as the owner of IBON suffices to... It isn't that it suffices. It's that it's pertinent. They're not saying suffice. It isn't the sum of the evidence, right? Well, the sum of the evidence is inference upon inference, and realizing that there can be this buildup of inference, but each inference, according to case law, must be linked to other reasonable inferences. When we have such unreasonable inferences as the foundation of all of the other inferences, it cannot be said that this meets the standard of proof beyond a reasonable doubt, and although the government... Counsel, Judge Gould interjecting, please, with a question. Isn't the real standard under Jackson v. Virginia whether a rational jury, giving all inferences to the government here, could find the elements beyond a reasonable doubt? Your Honor, yes, that is the standard. Jackson v. Virginia also indicates that this... In health care, well, Jackson also indicates that there is this near certainty. However, in health care cases, the near certainty or the standard beyond a reasonable doubt requires both knowing and intentional conduct in order to avoid just this type of conviction of someone who is being used as a pawn, and her father, in fact, should be the one to bear all of the criminal responsibility and not her. The fact that she was present, she was a full-time student, she was 20 years old, she was living at home... All of this leads to substantial questions about prosecutorial discretion, but does it lead to substantial questions about... which I gather the district judge sort of echoed, I mean, that is, he recognized that none of this would have happened but for her father, but that's not the question before us, right? The question before us is, was there substantial evidence? That's correct, but we do think that those are elements which go to whether or not there was substantial evidence to meet the burden of proof. And as we argued, for example, the Iruq case cited by the government is much different from the factual circumstances in Ms. Agbu's case, although that was an unpublished... the Iruq case is an unpublished memorandum, which is somewhat problematical because it is somewhat of a truncated opinion without substantial development of the underlying facts. However, in reading the government's briefing to show what evidence was presented in the light most favorable to the government, we see that Iruq was involved in personally creating four durable medical equipment companies, and that once the investigation became known, she and her husband, who was also indicted, specifically hired several people to so-called clean the documents that showed their violation of Medicare rules and the fraudulent carry-ons of these companies. This is so different from the facts that we have with Ms. Agbu, to such an extent that we don't think that a reasonable juror could find her guilty based on the standard of proof, even when looking at the facts in the light most favorable to the government. We have the testimony that all of the inferences presented by the government shows nothing in the light most favorable to the government. There is nothing more than a full-time college student obeying her father, showing up, certain files are at this location. She has nothing to do with the hiring, the management, phone calls, even the telephones that belonged to one of the marketers. It was an account owned by Mr. Agbu. The evidence did not show that there were any phone calls made between any of the marketers to Mr. Agbu. And when we look at the totality of this evidence, it falls short of the knowing and intentional conduct required. I also have argued the ineffective assistance of counsel in the case. We know that on the eve of the beginning of the trial, her attorney, Mr. Agbu, indicated to the court that he was not prepared to go to trial at that time. And we see from the record that he failed to make a pre-trial motion regarding the interview of the agents of Ms. Agbu. Those statements given by her during that interview would have been an appropriate motion, a Miranda motion pre-trial. They did not do that. What they did do was, at the close of the government's case, they brought the Miranda motion as part of the Rule 29 for a motion of acquittal. The record is replete with her trial attorneys not understanding how to introduce certain evidence, how to... But ordinarily we don't do this on direct appeal, right? Ordinarily, unless the record has been significantly established. And the record in this particular case meets the criteria of establishing the deficiencies of her trial counsel's attorneys. What did the district court say about the Miranda issue? Didn't he say that he would have ruled against her anyway? He ruled against her. He ruled against... On the merits of the Miranda issue, he would have ruled against her. Well, he ruled against her motion at the end of the trial, yes. However, it was... Would have made it at the right time. Well, had he made it at the right time, there possibly could have been more testimony, more witnesses. But we don't know that because it didn't happen. That's right. We don't know it, which is why you can't litigate it now. But we do know that it was brought at the wrong time and there was no basis for him not to have brought it timely as a pretrial motion. Coupled with the other aspects of the representation her attorneys provided her. We would also argue that the restitution issue was unreasonably foreseeable to her as far as the $10 million that... I mean, that's one issue here which does give me some pause. And I... Does it really make a difference? Is she going to come up with $5 million rather than $10 million or $2 million rather than $1 million? I mean, does it matter? Well, from a practical point of view, as far as her ability to pay $10 million or any part of $10 million... $5 million or $100,000 or $500,000 or any of that? No, but in the future, it may have an impact as far as any credit that she may attempt to get, be it... If it's a larger amount, it may have a larger impact than a smaller amount. I do see that I have a few seconds left. I would like to reserve that for any rebuttal. Thank you. Good morning, Your Honors. Joanna Bowman for the United States. May it please the Court. Viewing the evidence in the light most favorable to the prosecution, the evidence clearly established that Ms. Agbu knowingly and willfully conspired to commit health care fraud and committed substantive health care fraud. She knew that paying kickbacks for prescriptions in patients was illegal. However, she did it anyways. She did it anyways, meaning she handed an envelope to one doctor? She... Dr. Van Putten testified that he gave her prescriptions, and then in exchange, she gave him cash. Well, what he testified to was that the taller daughter or the larger daughter or something did that. Yes. Both federal agents confirmed that Ms. Agbu was the taller daughter, as well as patient marketers Wall O'Brien. She also confirmed that she was the taller daughter. And the relationship between Dr. Van Putten and Yvonne was so corrupt that Dr. Van Putten was examining patients at Yvonne when Ms. Agbu was present. Zawala O'Brien confirmed that she would bring patients to Yvonne to be examined by Dr. Van Putten. And Ms. Agbu was present during those times. She stated that she brought patients in 2010 for approximately two months, two to three times a week. Zawala O'Brien also confirmed that she received cash payments in an open envelope from Ms. Agbu. Zawala O'Brien, she was a patient marketer for both Yvonne and Bonfi, who recruited the Medicare beneficiaries. She would solicit them at markets and swap meets and bring them to various doctors. Zawala O'Brien also testified that she, that on occasions, after recruiting some of these beneficiaries, she would call Bonfi or Yvonne, and on occasions Ms. Agbu would answer and tell her to bring the patients to particular doctors for examinations. There was approximately $200,000 withdrawn from Yvonne's bank account on which Ms. Agbu would pay. It was a sole signatory. The federal agents testified that such large cash withdrawals signified marketing. It was a red flag for marketing. Well, I mean, that's kind of, I saw that and I thought, what do they know about what she did with her $200,000? In their experience, they testified that large cash withdrawals from medical, durable medical equipment companies signified marketing, and the jury could reasonably come to that conclusion. Maybe they could as a matter of argument, but I don't think there's evidence of that kind as competent evidence. Anyway, go ahead. Ms. Agbu also knew that the prescriptions had to be medically necessary, and she could plainly see that the individuals brought to Yvonne did not qualify for power wheelchairs. In fact, 44% of Yvonne's claims came from two top referring physicians, Dr. Iodelli and Dr. Van Putten. The government's medical expert, Dr. Fullerton, testified that he examined approximately 380 of Dr. Iodelli's patient files, and none of those patients qualified for power wheelchairs. And Dr. Van Putten testified that almost all of the patients he examined did not qualify for power wheelchairs, including the patients he examined at Yvonne when Ms. Agbu was present. But she's not a doctor, and she's not responsible for the prescriptions, right? She knew that these prescriptions were purchased. I understand that, but as to the substance of them, she's not responsible for them. Well, if she knew that the prescriptions were not medically necessary, then she should not have submitted. Right, but how does she know they're not medically necessary? She's not a doctor. She may know that they were paid for, but she still doesn't know they're not medically necessary. Well, the fact that they were paid for shows that they were not medically necessary. Maybe. And Ms. Agbu told the federal agent that she was the owner of Yvonne. She held herself out as the owner of Yvonne to Medicare in both the Medicare application, as well as other Medicare documents. Agreed. I mean, that's a factor, but it certainly wasn't a major factor or enough by itself. Not necessarily by itself, but viewing the evidence as a whole, a jury reasonably could conclude that Ms. Agbu knowingly and willfully participated in the scheme and conspired to commit health care fraud and committed substance health care fraud. If the Court doesn't have any further questions. Well, the one thing that's given me some pause is the restitution. The bulk of that restitution had to do with the prior entity that her father ran and not the one that she was. I mean, you just told me how important it was that she was the president of this. And the bulk of the restitution didn't have to do with this company. Is that right? Did not have to do with the Yvonne company. It had to do with the other one. Yes, but she was part of a scheme that included both Bonfi and Yvonne. Well, I mean, that seems to me to be a lot less clearly proven in that. All of the evidence you were talking about has to do with Yvonne, right? Everything you just recited about the sufficiency of the evidence, everything had to do with iPod. Is that right? At this point, however, the government proved that all of the marketers worked for both companies. Zoella O'Brien, Miss Estrada. But iPod had never happened, presumably. There was no evidence that was put on that would have made her liable without iPod. Well, she did work. I know she worked there, but you don't have any proof with regard. What's the name of the other company? Bonfi. You have no evidence with regard to Bonfi that she knew what was going on there separately. Well, she knew that the companies were both. Both companies were intimately involved with each other. They shared marketers. They shared physicians. They shared beneficiaries. I don't know the answer to this, but was the restitution amount that went to Bonfi have to do with the parallel time or a prior time before iPod existed? So, two years. The restitution amount for Miss Agbu started in December 15, 2007. It was based on a paycheck. She worked part-time at Bonfi. Her position at Bonfi was in her employment application. It stated that she applied for the position of sales and marketing. And the government submitted that application as well as her first paycheck from Bonfi in 2006. So, the restitution amount that goes to the Bonfi company, was it for the period before iBon existed or both, while iBon existed and also before it existed? Correct. While eBon existed and prior. Well, what about for the period prior? I don't understand. I just don't see her connection. I mean, I understand she was connected to it, but I don't understand where there was any evidence of her knowing participation in the conspiracy at that point. Well, the government proffered that she worked there and the court was bound to resolve any question by a preponderance of the evidence on that issue. And that's it? The evidence was she worked there? She worked there and she received a paycheck. She did what? She received her first paycheck from Bonfi in December 15, 2006. And that's what the basis of the restitution order was. I understood the government's argument, because there's no evidence that she knowingly participated during that period, to be essentially it doesn't matter whether she knowingly participated during that period. Is that your argument? Because the conspiracy encompassed both companies and both time periods and whether she was part of it earlier on doesn't matter? Was that your argument? No, it didn't encompass both companies. And certainly Yvonne was not in existence until February 2008 or even actually January, I'm sorry, July of 2007. That's when I believe the company was incorporated and it did not submit claims to Medicare or did not apply to Medicare until February 2008. But there was no other evidence proffered showing her involvement prior to 2008. What is the basis for concluding that she was part, does she have to have been part of the conspiracy during that period, i.e. a knowing participant at that point? Yes. Because I read your brief to try and get around this by saying otherwise. It didn't even matter at that point whether she was a knowing participant at that point as long as she was a knowing participant later. You're not arguing that. So if you're not arguing that, I think you're on really weak, I mean, I think that argument is probably wrong, but I think it seems to me you're on really weak ground because there's just no evidence that she was a knowing participant for that earlier period, and she wasn't convicted of it. No, but it was part, she was convicted of the, it does not matter if she was convicted of the specific counts, but she was convicted of the conspiracy and the two health, and the eight health care fraud counts. Right, and she was, if you divide the conspiracy broadly, she was a knowing participant for part of the time period, but for restitution purposes, I would think she'd have to be a knowing participant for the period that she's being charged with restitution. Yes. Thank you. If there's no further questions, the government rests on its brief. No questions here. One minute of rebuttal, thank you. Thank you. In responding to the government's arguments just now made, when Charles Agbu testified, he said that two patients were, he allowed Dr. Van Putten to bring in two patients to Ibon early in the morning, before it opened at 11 o'clock. The question isn't what he said, the question is what the evidence as a whole showed, and I gather that said otherwise. He seemed to say there were more instances and so on. He didn't say that. He said that Dr. Van Putten's testimony may have been that he went there, but it was not that Ms. Agbu knew anything that illegally was going on. And when we look at the manual, which is part of the government's exhibits of Agapi manual. He went there and did examinations frequently and she was there? No, it was not frequent. He said that she was at Ibon, not present where he was at Ibon. There was more than one room. As the agents testified when they went to Ibon to question her, they went into an office and the door was closed. Ibon is not just one room. So there was no evidence that Ms. Agbu knew what was going on, and according to the testimony, it happened twice before she arrived. The other item is that the government makes no explanation as to what qualified a patient as medically necessary. Even in its arguments just now, it does not indicate why. And if we look at the government supplemental excerpt of record, which we cited in our reply brief, the Agapi manual encourages marketing to learn who the physicians are. Go to dialysis centers, go to malls. There was a complete legal presentation of marketing the durable medical equipment, the supply. And there's actually no evidence that Ms. Agbu actually knew that prescriptions were being bought. She knew that a doctor was working and seeing patients, and oftentimes it might have been the same doctor. That does not prove that she knew that these were fraudulent prescriptions, and we would submit it on that. Thank you.
judges: Gould, Berzon, Steeh